1   JASON BARTLETT (State Bar No. 214530)
jbartlett@mkwllp.com

2   MARC J. PERNICK (State Bar No. 160591)
mpernick@mkwllp.com

3   MAURIEL KAPOUYTIAN WOODS LLP
275 Battery Street, Suite 480

4   San Francisco, California 94111
Telephone:  415-738-6228

5   Facsimile:   415-738-2315

6   *Attorneys for Defendants*
JOSEPH ALTER and

7   JOSEPH ALTER, INC.

8                        UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10  AUTODESK, INC.,                          )  Case No. 3:16-cv-04722-JSC
                                             )
11                         Plaintiff,        )
                                             )
12              v.                           )  **MOTION TO DISMISS OR STAY**
                                             )  **COMPLAINT FOR DECLARATORY**
                                             )  **JUDGMENT OF NON-INFRINGEMENT**
13  JOSEPH ALTER and                         )  **OF U.S. PATENT NO. 6,720,962**
    JOSEPH ALTER, INC., a California         )
14  corporation,                             )
                                             )  Date: Thursday, November 10, 2016
15                         Defendants.       )  Time: 9:00 am
                                             )  Dpt.: San Francisco, Courtroom F
16                                           )
                                             )  Complaint Filed: August 17, 2016
17  _____ )

18

19

20

21

22

23

24

25

26

27

28

Mot. to Dismiss or Stay Decl. J. Compl.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 10, 2016, at 9:00 am, before the Honorable Jacqueline Scott Corley of the United States District Court for the Northern District of California, or as soon thereafter as this matter may be heard, defendants will move the Court, pursuant to Rules 12(b)(1) of the Federal Rules of Civil Procedure, to dismiss this action or, in the alternative, to stay pending resolution of *Joseph Alter and Joseph Alter, Inc. v. The Walt Disney Company* filed on July 22, 2016 in the Superior Court of California for the County of Los Angeles.  The grounds for this motion, as set forth in detail below, are that:  (1) under the totality of the circumstances, Plaintiff has no objectively reasonable apprehension of suit sufficient to sustain jurisdiction under the Declaratory Judgment Act, and (2) even if such jurisdiction exists, the Court should exercise its discretion to stay this suit to prevent prejudice to Defendants.

## ISSUES TO BE DECIDED

1.      Whether there exists a case or controversy sufficient to confer jurisdiction over this action under the Declaratory Judgment Act and, if so, whether the Court should decline to exercise that jurisdiction at this time.

2.      Whether this suit should be stayed in favor of the first-filed action between patent owner Alter and Disney, which is the original manufacturer of the accused product.

## MOTION

Pursuant to Federal Rule 12(b)(1), Defendants Joseph Alter and Joseph Alter, Inc. (together "Alter") move to dismiss or stay this suit pending resolution of the first-filed *Joseph Alter and Joseph Alter, Inc. v. The Walt Disney Company* now before the Central District of California.

MOT. TO DISMISS OR STAY DECL. J. COMPL.

1

**INTRODUCTION**

2      This is a suit designed to place a small business on the horns of a legal dilemma.  Patent

3  owner and computer animation software developer Joseph Alter has a license agreement with the

4  Walt Disney Company ("Disney") that Alter believes Disney breached by entering into an

5  arrangement with Autodesk, Inc. to let Autodesk take over and develop a Disney software product

6  called "XGen™" and to sell it in competition with Alter's "Shave and a Haircut™" software.

7  Alter sued Disney for breach and, in connection with an informal request for documents, told

8  Autodesk that it considered Autodesk's version of XGen to be outside the scope of the Disney

9  license.  Disney has threatened to countersue Alter for breach of the license if Alter asserts patent

10  claims against Autodesk.  According to Disney, Autodesk is its customer and XGen is a "Licensed

11  Product" under the Disney-Alter license.  Disney asserts that Alter has therefore covenanted not to

12  sue Autodesk in connection with XGen.  Hence Alter's dilemma arising from this action:  he can

13  assert compulsory counterclaims against Autodesk for infringement and risk breaching the Disney

14  license, or decline to assert counterclaims and risk waiving them.

15      There is no need for this suit to proceed now.  The contract and exhaustion issues that

16  underlie it will be litigated in the first-filed Disney action.  Autodesk will suffer no harm from

17  delay.  Autodesk purports to be the "customer" in the Disney-Autodesk relationship.  Alter's claim

18  against Disney—the purported "manufacturer"—would be entitled to proceed first even if it were

19  *not* the first-filed action.   Alter asks that the Court dismiss this action without prejudice or, at a

20  minimum, stay it until Alter's first-filed suit against Disney reaches a conclusion.

21

**FACTS**

22      This dispute relates to advanced hair and fur simulation software for computer animation.

23  Declaratory Judgement Plaintiff Autodesk makes Maya™, an industry-leading computer

24  animation software package.  *See* Declaration of Joseph Alter in Support of Motion to Dismiss or

25  Stay ("Alter Decl.") ¶ 3.[1]   The defendants are computer animation software developer and

26  inventor Joe Alter and his eponymous small business.  Joe Alter, Inc. makes and sells Shave and a

27

28  ───────────────
[1] Unless otherwise stated, all fact cites are to the Declaration of Joseph Alter.

1    Haircut™, a program for simulating hair and fur available for purchase as an extension ("plug-in")

2    to Maya and other Autodesk programs.  Id. ¶ 2.  The core technology underlying Shave and a

3    Haircut is claimed in Alter's U.S. Patent 6,720,962.  It enables efficient, realistic animation of hair

4    and fur that appears to move naturally.  Id. ¶ 4.  The '962 Patent was filed in December 2000 and

5    the U.S. patent office has frequently cited it as prior art against subsequent applications filed by

6    animation industry leaders such as Pixar, Disney, Sony, Microsoft, and Dreamworks.  Id., Ex. 1.

7         Shave and a Haircut, now in its ninth version, was successful for many years.  It

8    consistently earned a modest income for Alter.  Id. ¶ 5.  It was employed to help make such

9    popular films as "Pirates of the Caribbean," "X-Men," "King Kong," and "Charlotte's Web."  Id.

10   Alter Inc. derived most of its revenue from sales to Autodesk users and Mr. Alter considered

11   Autodesk more a partner than a channel of trade.[2]  Id. ¶ 6.  In 2006, Autodesk Vice President and

12   General Manager of Autodesk's Media and Entertainment Division, Mark Petit sent a letter to the

13   Academy of Motion Pictures supporting Mr. Alter's nomination for an Academy Award in

14   Scientific Achievement, citing his "innovative set of tools" and "original research."  Id. ¶ 7,

15   Exhibit 2.

16        Five years later, in 2011, Autodesk announced at a computer animation industry

17   conference that it had agreed to license and sell as a plug-in to Maya a software tool called

18   "XGen™" that Disney developed in-house to animate Rapunzel's hair in its film "Tangled."

19   Mr. Alter contacted Disney regarding the '962 Patent and eventually sued it for infringement in

20   the Northern District of California.  Alter proceeded without legal representation in the suit and

21   subsequent settlement.  Id. ¶ 8.

22        In resolving the Disney suit, Mr. Alter granted what he understood from the language of

23   the settlement agreement and contemporaneous correspondence to be a limited license allowing

24   Disney to distribute its XGen software, as-is, through Autodesk as a free plug-in module

25   distributed with Maya.  Mr. Alter accepted a small settlement payment because he felt he could

26   not afford the cost of patent litigation against Disney and because he did not consider the Disney-

27

28   _____
     [2] Disney was also an Alter customer and client.  Id. ¶ 6.

1   made software to be a serious competitor.  As a production company, Disney makes unrefined,

2   special-purpose tools sufficient for its needs in specific films.  It does not have the resources or

3   incentive to make powerful, refined tools to enable others (including Disney's competitors) to

4   make films as technologically advanced and compelling as those Disney itself makes.  Id. ¶ 9.

5   In the years since the Disney suit, Mr. Alter watched in dismay as XGen was extensively

6   refined and its feature set expanded.  Rather than withering on the vine, XGen appeared to have

7   undergone a serious development effort.  Alter's revenues and profit margins collapsed as it

8   plowed investment into Shave and a Haircut, trying to stay far enough of ahead of XGen to

9   compete with the free distribution of XGen to all of his Maya customers.  Last year, everything

10  began to be become clear when Mr. Alter learned through his personal network that Disney had

11  given Autodesk the full source code to XGen, and that Autodesk, not Disney, has been developing

12  it.  In effect, XGen is no longer a Disney product.  XGen is now an Autodesk product.  Id. ¶ 10.

13  Autodesk can spend heavily on development and still offer XGen for free because

14  Autodesk derives its revenues from sales of Maya itself, not from plug-ins.  Autodesk has

15  overwhelming resources and incentive to expand and polish XGen into an industry-leading hair

16  and fur simulator, eliminating small plug-in operators like Alter.  Id. ¶ 11.

17  When Mr. Alter contacted Disney and Autodesk about this state of affairs, Autodesk

18  asserted that the Disney settlement and license agreement had exhausted the '962 Patent and that

19  its agreement with Disney entitled it to do whatever it wanted with XGen free of the patent –

20  including making unlimited copies and whatever modifications and expansions that Autodesk

21  might like, adapting and recompiling it to work with other products, operating systems and

22  machines, and sublicensing the product to other companies for use with their products.  In

23  practical effect, Disney and Autodesk asserted that Disney had acquired the right to sublicense the

24  '962 Patent to anyone with no additional compensation to Alter – something that Mr. Alter made

25  clear at the time of the settlement he was not willing to do except at a price sufficient to buy him

26  out of the business.  Id. ¶ 12.

27  Through the first half of 2016, Mr. Alter had a long series of informal communications

28  with his contacts at Autodesk and Disney about this problem.  In these communications, Mr. Alter

1   made clear that he considered Disney liable for having exceeded its rights under the settlement

2   agreement.   Disney asserted that any infringement would be Autodesk's responsibility and

3   suggested that Alter take the matter up with them.   At the same time, Disney counsel reminded

4   Alter that the settlement agreement contains a covenant not to sue Disney's customers (which

5   Autodesk purports to be) in connection with "Licensed Products" under the settlement agreement.

6   Disney threatened to counterclaim against Alter if he violated that provision by suing Autodesk.

7   In view of Disney's threat, Alter had no intention of suing Autodesk. Id. ¶ 13, Exhibit 3.

8          On July 22, 2016, Alter Inc. sued Disney for breach of contract in California State Court.

9   Id. ¶ 14, Exhibit 4.  Alter alleges that Disney's apparent broad grant of control of the XGen

10   product to Autodesk, and Autodesk's expansion and sale of an Autodesk-version of XGen,

11   breached the settlement agreement.  He seeks damages resulting from Disney's failure to comply

12   with the terms of the Settlement Agreement and Disney's efforts to help Autodesk avoid the '962

13   Patent.  Disney removed the contract suit to the Central District of California and moved to stay

14   pending the resolution of this later-filed declaratory judgment suit.  The stay motion and a motion

15   to remand are now pending. Id. ¶ 14.

16          On July 26, 2016, Alter's counsel in the Disney litigation notified Autodesk of the suit and

17   requested that Autodesk provide copies of its correspondence with Disney relating to the

18   settlement agreement.  Alter believes that this agreement and surrounding correspondence (which

19   have been withheld) will support its breach of contract action by demonstrating that Disney

20   always intended, contrary to its representations at the time of the settlement, to enable Autodesk to

21   treat XGen as an Autodesk product and as a convenient, inexpensive means of conferring the

22   equivalent of a sublicense of the '962 Patent.  In the letter, Alter also stated that it considered

23   Autodesk's sale of XGen outside the scope of the Disney settlement to be an infringement of the

24   '962 Patent.  Id. ¶ 15.

25          On August 17, Autodesk filed this action for declaratory judgment of non-infringement,

26   exhaustion, and license.  Autodesk has not alleged that the '962 Patent is invalid.  Mr. Alter—once

27   again finding himself in a patent suit without a lawyer—repeatedly contacted Autodesk's counsel

28   asserting that no litigation between Autodesk and Alter concerning XGen and the '962 Patent

1   would be reasonable until his contract dispute with Disney was resolved.  Autodesk was unmoved.

2   Id. ¶ 16.

3   　　　To summarize, Alter has a state contract action against Disney pending in federal court,

4   subject to remand.  The gravamen of Alter's suit is that XGen in its current form is not a

5   "Licensed Product" under the Disney settlement agreement and that Disney has therefore breached

6   by helping Autodesk make its own unauthorized hair and fur simulation plug-in.  Disney's defense

7   is that XGen is a Licensed Product—even if Autodesk has gone far beyond "distributing" a Disney

8   product to develop a new product competitive with Alter's Shave and a Haircut.  If Disney is right,

9   then Autodesk is a mere Disney customer that enjoys the protection of Alter's covenant not to sue

10   purchasers of Disney's Licensed Products.  If Alter is right, then XGen in its current form is

11   unlicensed and the covenant not to sue does not apply to Autodesk.  Either way, the issue will be

12   resolved in the Southern California litigation in which the litigants, properly, are the parties to the

13   disputed settlement agreement.

14   　　　This declaratory judgment suit by Autodesk is an attempt to place Alter on the horns of a

15   dilemma.  Alter can litigate this suit and assert the compulsory counterclaim of infringement, but

16   that would expose him to a claim of breach of his covenant not to sue Disney customers if Alter's

17   view of the settlement agreement does not prevail in Southern California.  Alter can litigate this

18   suit without asserting counterclaims of infringement, but that would potentially waive the claims.

19   Moreover, as Autodesk knows well due to its unique position as the only remaining channel for

20   direct sales of Shave and a Haircut, Alter has been crushed by the weight of its competition and

21   cannot afford litigation on two fronts.  Autodesk's unusual and aggressive move to initiate a patent

22   suit while at the same time purporting to be the purchaser of the allegedly infringing product rather

23   than its manufacturer appears to be driven in part by its belief that Mr. Alter—who already once

24   resorted to self-help to assert his patent claims against Disney – cannot mount a good defense

25   against a well-resourced opponent represented by a large firm.[3]

26

27   ───────────────

28   [3] To recapitulate, Alter makes "Shave and a Haircut" which it sells as a plug-in to Autodesk's
     "Maya" computer animation software suite.  Shave and a Haircut competes with "XGen," a
     plug-in originally made by Disney but which Autodesk appears to have taken over.

MOT. TO DISMISS OR STAY DECL. J. COMPL.

1

**LEGAL STANDARD**

2

1.      Standard for Motion to Dismiss Declaratory Judgment Action

3        Under Federal Rule of Civil Procedure 12(b)(1), a Court may dismiss an action for "lack of

4   jurisdiction over the subject matter."  Plaintiff bears the burden of proving the existence of subject

5   matter jurisdiction. *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996).  The test is

6   "whether the facts alleged, under all the circumstances, show that there is a substantial

7   controversy, between parties having adverse legal interests, of sufficient immediacy and reality to

8   warrant the issuance of a declaratory judgment."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S.

9   118, 127 (2007) (quotations omitted).  The "the objective words and actions of the patentee"

10  control the analysis.  *BP Chems. v. Union Carbide Corp.*, 4 F.3d 975, 979 (Fed. Cir. 1993)).

11        Factors that courts consider in determining whether declaratory jurisdiction exists include:

12        1. the strength of any threatening language in communications between the parties;

13        2. the depth and extent of infringement analysis conducted by the patent holder;

14        3. whether the patent holder imposed a deadline to respond;

15        4. any prior litigation between the parties;

16        5. the patent holder's history of enforcing the patent at issue;

17        6. whether the patent holder's threats have induced the alleged infringer to change its

18            behavior;

19        7. the number of times the patent holder has contacted the alleged infringer;

20        8. whether the patent holder is simply a holding company with no source of income other

21            than enforcing patent rights;

22        9. whether the patentee refused to give assurance it will not enforce its patent;

23        10. whether the patent holder has identified a specific patent and specific infringing

24            products;

25        11. the extent of the patent holder's familiarity with the product prior to suit;

26        12. the length of time that transpired after the patent holder asserted infringement; and

27

28

Mᴏᴛ. ᴛᴏ Dɪsᴍɪss ᴏʀ Sᴛᴀʏ Dᴇᴄʟ. J. Cᴏᴍᴘʟ.

13. whether communications initiated by the declaratory judgment plaintiff have the appearance of an attempt to create a controversy in anticipation of filing suit.

*See Activevideo Networks, Inc. v. Trans Video Elecs. Ltd.*, 975 F. Supp. 2d 1083, 1088 (N.D. Cal. 2013).  A patentee's refusal to give assurances of non-enforcement is not dispositive because a patentee has no obligation to "make a definitive determination, at the time and place of the competitors' choosing, that it will never bring an infringement suit."  *See Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1341 (Fed. Cir. 2008).

Even if facts sufficient to sustain jurisdiction exist, the Court may decline to exercise it. *MedImmune*, 549 U.S. at 136 ("The Declaratory Judgment Act provides that a court 'may declare the rights and other legal relations of any interested party,' not that it must do so. This text has long been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.") (quoting 28 U.S.C. § 2201(a)).  In exercising its discretion, "[t]he court must make a reasoned judgment whether the investment of time and resources will be worthwhile." *Serco Servs. Co., L.P. v. Kelley Co., Inc.*, 51 F.3d 1037, 1039 (Fed. Cir. 1995).

2.    Standard for Motion to Stay

A district court has discretionary power to stay proceedings.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.").  The court "may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." *Leyva v. Certified Grocers of Cal. Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979).  Among the factors to be weighed in deciding whether to stay a pending proceeding "are the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005).

1

### ARGUMENT

2        Taken as a whole, the circumstances surrounding this dispute do not support Autodesk's

3   pleading of subject matter jurisdiction under the Declaratory Judgment Act.  Even if jurisdiction

4   exists, the Court should exercise its discretion to dismiss or stay this suit pending resolution of the

5   first-filed action against Disney.  Forcing Alter to proceed against Autodesk now would unfairly

6   force him to choose between waiving his claims or taking steps that Disney has asserted would put

7   him in breach of the parties' settlement agreement.  On the other hand, staying or dismissing this

8   suit would not harm Autodesk.  It would reduce the risk of inconsistent verdicts.

9

10  **I.     THIS DECLARATORY JUDGMENT SUIT SHOULD BE DISMISSED BECAUSE DEFENDANTS' CLAIMS ARE AIMED AT DISNEY, NOT AUTODESK.**

11       Plaintiff's complaint relies on a single letter to establish declaratory jurisdiction while

12  failing to take account of the broader context of the parties' relationship.  Alter is a long-time

13  Autodesk partner and all of its revenue is tied to sales to Autodesk customers.  (Alter Decl. ¶ 6.)

14  Autodesk knows that Mr. Alter has no desire to sue Autodesk and that he considers Disney

15  responsible for the current state of affairs.  Alter sued Disney, not Autodesk, even as Disney was

16  pointing the finger at Autodesk.  (Id. ¶ 12, Exhibit 3.)  While it is true that the letter Alter's

17  attorney sent to Autodesk states that it is infringing, it is clear from the face of the letter that its

18  purpose is to seek documents for use in the Disney litigation.

19       While the discovery request letter Mr. Alter's counsel sent does contain some strongly

20  worded language referring to a specific product, all of the other factors compiled in *Activevideo*

21  *Networks* weigh against Declaratory Judgment jurisdiction.  Alter has not suggested he has

22  analyzed Maya for infringement apart from his contention that the *Disney's* product practices the

23  patent.  He has imposed no response deadline.  There is no prior litigation history between

24  Autodesk and Alter and his history of enforcing the patent against Disney cuts against jurisdiction

25  because it further confirms that the first-filed suit is the one Alter intends to pursue.  Autodesk

26  does not allege that it has changed its behavior as a result of Alter's allegations.  Alter has

27  contacted Autodesk on several occasions not to allege infringement, but to seek Autodesk's

28  cooperation in asserting his claims *against Disney*.  Alter is no mere patent holding company – it

MOT. TO DISMISS OR STAY DECL. J. COMPL.

1   is a practicing entity that has a successful product implementing the patent that it hopes to

2   continue selling in partnership with Autodesk.  (Id. ¶ 2-6.)  Finally, while Alter has not assured

3   Autodesk that he will never assert his patents, he *has* made clear that he will not initiate litigation

4   until the question of whether XGen in Maya is a Licensed Product is resolved.

5       Even if the Court finds it has Declaratory Judgment jurisdiction, it should exercise its

6   discretion to abstain from exercising that jurisdiction now.  As discussed in the next section of this

7   brief, forcing Alter to proceed against Autodesk now would be extremely prejudicial to Alter, and

8   a delay will cause no significant harm to Autodesk.[4]

9   **II.   IF NOT DISMISSED, THIS ACTION SHOULD BE STAYED UNTIL THE**
10  **CONTRACTUAL QUESTION OF WHETHER XGEN IS A "LICENSED**
    **PRODUCT" UNDER THE DISNEY SETTLEMENT CAN BE RESOLVED.**

11      Right now, there are two separate suits pending that turn on the exact same question:  is

12  XGen still a "Licensed Product" under the Disney-Alter settlement agreement if Disney has

13  handed over all source code and development control to Autodesk and granted Autodesk the

14  independent right to make and sell unlimited copies?  (Id. ¶ 14, Exhibit 4.)  Alter's understanding

15  of the settlement agreement is that Disney is limited to selling its own version of XGen through

16  third-party distributors.  It does not confer the right to grant the equivalent of a royalty-free

17  sublicenses of the '962 Patent.  Disney disagrees.  The first-filed action is best suited to resolve

18  that threshold question because the litigants are the parties to the settlement agreement.

19      Forcing Alter to proceed against Autodesk now would put him in an untenably prejudicial

20  position.  Disney contends that Alter would be liable for breach of his covenant not to sue Disney

21  customers in connection with Licensed Products if he were to assert claims against Autodesk.

22  (Id.)  Yet Alter *must* counterclaim for infringement in this suit or else his claims could be waived.

23  Alter should not be forced to choose between potential breach of contract and waiver.  He did the

24  right thing by asserting his claims first against Disney and seeking to clarify the scope of the

25

26  ───────────────
    [4] Autodesk's complaint also goes far beyond XGen to seek a declaration that none of its products,
27  including Maya, infringe.  Maya has hundreds of modules including multiple hair and fur
    modules.  (Alter Decl. ¶17.)  Alter has not made any accusations relating to any Autodesk-related
28  product apart from Disney's XGen, and has no obligation to undertake any such analysis.  *See*
    *Prasco, LLC*, 537 F.3d at 1341.  If this case were to proceed, it would have to be narrowed.

Mot. to Dismiss or Stay Decl. J. Compl.

1  license agreement.  There is a strong presumption that infringement claims should be asserted

2  against the manufacturer of the accused product, not its customers.  *In re Nintendo of Am., Inc.*,

3  756 F.3d 1363, 1365 (Fed. Cir. 2014) (discussing the "customer suit doctrine").  Here we have the

4  unusual situation of the customer (Autodesk) trying to leap ahead of a suit against the

5  manufacturer (Disney).  If the preference in favor of a suit against the manufacturer is strong

6  enough to overcome the ordinary presumption in favor of the *first-filed* action, then certainly it

7  should outweigh the customer's attempt to proceed in a parallel *second-filed* action.

8       Staying this suit would promote the interests of judicial efficiency and reduce the risk of

9  inconsistent verdicts.  If Autodesk is allowed to proceed now, it is possible that Autodesk will

10  succeed in establishing the XGen is a Licensed Product but that Disney will fail, or vice versa.  If

11  the Disney suit is allowed to proceed to its conclusion before the Autodesk suit, then the risk of

12  such inconsistent verdicts will be reduced and judicial resources may be conserved.  *Microsoft*

13  *Corp. v. TiVo Inc.*, No. 10-CV-00240-LHK, 2011 U.S. Dist. LEXIS 52619, at *19 (N.D. Cal. May

14  6, 2011) (staying litigation in part to minimize the risk of inconsistent conclusions regarding the

15  same patent resulting from separate proceedings).  If Disney succeeds in establishing that XGen is

16  still a Licensed Product, then Alter's patent rights against Autodesk will be exhausted and this suit

17  will be moot.

18       In stark contrast to the severe prejudice Alter will suffer if Autodesk is allowed to proceed,

19  Autodesk will suffer no significant prejudice if this action is stayed.  Autodesk committed to its

20  course of action with respect to XGen years ago.  If it had wanted to remove any "cloud of

21  uncertainty" around XGen, it could have made its intentions clear to Alter in 2011 and requested

22  an independent license.  If the risk of potential claims by Alter was not sufficient to cause

23  Autodesk to pause to seek independent clarification of its right to practice the '962 Patent, then

24  certainly it is not sufficient to cause Autodesk to change its direction with respect to XGen.

25  Moreover, it appears likely that Disney has indemnified Autodesk against patent claims relating to

26  XGen.  This suit is not an attempt to lift any cloud of uncertainty hanging over Autodesk.  Rather,

27  it is an attempt to multiply the burden of litigation on Alter, a small, struggling business that could

28  not even afford a lawyer the last time it attempted to assert its patent claims in this Court.

-12-

1     In sum, all of the stay factors weigh in favor of a stay in this case.  Autodesk will suffer no

2  damage as a result of a stay, but Alter would suffer substantial hardship and inequity by being

3  required to go forward.  Indeed, Alter would be forced to expose himself to claims for breach of

4  contract by Disney should he be forced to proceed now.  Allowing the Disney suit to proceed first

5  will simplify the issues to be litigated in this suit and may render it altogether moot.

6                                          **CONCLUSION**

7     For the foregoing reasons, Alter respectfully requests that the Court dismiss this action

8  without prejudice.  If not dismissed, then this action should be stayed pending resolution of Alter's

9  first-filed action against Disney.

10

11

12  Dated: October 3, 2016

13                                   Respectfully submitted

14                                   MAURIEL KAPOUYTIAN WOODS LLP

15

16                                   By:   _/s/ *Jason R. Bartlett*_____
                                          JASON BARTLETT

17

18

19

20

21

22

23

24

25

26

27

28

MOT. TO DISMISS OR STAY DECL. J. COMPL.