UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUTODESK, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>JOSEPH ALTER, et al.,<br><br>        Defendants. | Case No. 16-cv-04722-WHO<br><br>**ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

Plaintiff Autodesk, Inc. ("Autodesk") seeks a declaratory judgment of non-infringement of and a declaration of license, release, and/or covenant to the United States Patent No. 6,720,962 ("'962 patent") against defendants Joseph Alter and Joseph Alter, Inc. (collectively "Alter"). The '962 patent relates to software that improves the methods of generating and managing geometric systems of hair, fur, and other natural elements. In cross-motions for summary judgment, the parties contest whether Autodesk is an intended third party beneficiary of a license and distribution agreement between Alter and Walt Disney Company, and, if it is, whether that agreement protects Autodesk from the claims in this case. I find that Autodesk has standing to assert rights under the agreement and that the release and covenant not to sue in it apply to defeat Alter's claims. As discussed below, I GRANT Autodesk's motion for summary judgment and DENY Alter's motion.

**BACKGROUND**

**I.    FACTUAL BACKGROUND**

    **A.    Events Leading Up to This Lawsuit**

On April 13, 2004, the United States Patent and Trademark Office awarded Alter a patent relating to improved and more realistic generation of hair, fur, and other natural elements, entitled

*Hair Generation and Other Natural Phenomena with Surface Derived Control Volumes in Computer Graphics and Animation*. U.S. Patent No. 6,720,962 (filed Dec. 4, 2000). This is the patent at issue in this case. Sometime later in 2004, Alter granted Autodesk a license to the '962 patent for use with a product that is not at issue in this case. *See* Decl. of Jason Bartlett ISO Mot. for Summary Judgment ("Bartlett Decl."), Ex. C, Alter/Autodesk Software License and Distribution Agreement (Dkt. No. 131-3).

In 2011, Autodesk entered into a license and distribution agreement with the Walt Disney Co. ("Disney"). *See* Bartlett Decl., Ex. E, AutoDesk/Walt Disney License and Distribution Agreement. After the agreement was executed, Autodesk issued a press release captioned *Walt Disney Pictures and Autodesk Sign XGen Technology License Agreement*. Decl. of Barbara N. Barath ISO Oppo. to Mot. for Summary Judgment and Cross-Mot. for Summary Judgment ("Barath Decl."), Ex. 2, Autodesk August 9, 2011 Press Release (Dkt. No. 142-3). In it, Autodesk announced that the agreement would "enable Autodesk to make [Disney's XGen technology] available to artists to create digital entertainment." *Id.*

After reading the press release, Alter contacted both Disney and Autodesk. He expressed surprise at the scope of the agreement between Disney and Autodesk and concern regarding his own continued business viability. *See* Barath Decl., Ex. 3, Alter Letter to Disney (dated Aug. 12, 2001)[1] (Dkt. No. 142-4); Ex. 4, Email Chain Between Alter and Autodesk(dated Aug. 9-11, 2011) (Dkt. No. 142-5). In his letter to Disney, Alter noted that he had been aware of Disney's XGen tool since 2004 and was previously unbothered by the use of the potentially infringing tool because Disney only used the tool for internal production and the tool was inferior to his product. *Id.*, Ex. 3. But Disney's agreement with Autodesk would place the tool into the software market, and that threatened his livelihood. *Id.* Alter expressed a desire to resolve what he viewed as an attempt to infringe on his patent and push him out of the software market without litigation. *Id.* His concerns went largely unanswered.

On October 5, 2011, Alter filed a patent infringement lawsuit against Disney in the United

---

[1] Given the context of Alter's letter to Disney, 2001 is a typographical error, and the correct date is likely August 12, 2011.

States District Court for the Central District of California. *Alter v. Walt Disney Co.*, No. 11-cv-8277 (dismissed Feb. 10, 2012). The suit alleged that Disney infringed the '962 Patent "by making use of [Hair, Fur, and Arbitrary Geometry generation systems] as a key part of their production pipeline on a number of films" and by "a recently advertised licensing deal involving one of said systems (X-Gen) to Autodesk, Inc. for commercial sale and distribution as part of their Maya product worldwide in direct competition with [Alter]." *Alter v. Walt Disney Co.* Complaint ¶ 20 (Dkt. No. 109-3). Alter stated in his Complaint that Autodesk's press release informed him of the alleged infringement. *Id.* ¶ 12.

After the lawsuit was filed, Disney and Alter commenced negotiations over a license to resolve the litigation. During the negotiations, Alter remarked that Disney's proposed licensing agreement was broader than any he had ever signed. He asked that the licensing agreement be explicitly limited to the Autodesk XGen contract and the October 5, 2011 lawsuit. Bartlett Decl., Ex. R, Email Chain Between J. Alter and M. Premutico at ALT-00003877 (dated Jan. 27-30, 2012) (Dkt. No. 131-18). Disney refused, stating that "the scope of [the] license is not negotiable" because it did not "expect to ever have an issue with this patent again [as] reflected in the license scope." *Id.*

On January 31, 2012, Alter and Disney settled the lawsuit and executed a licensing agreement. The settlement allowed Disney the right to develop XGen and have it distributed by Autodesk. Decl. of Joseph Alter ISO Mot. for Summary Judgment Regarding License ("Alter Decl.") ¶ 23 (Dkt. No. 130-2). After execution of the agreement, Autodesk "sought and received confirmation from Alter that he would not assert claims of patent infringement against Autodesk for distributing Disney's XGen for Disney." Barath Decl., Ex. 16, Alter's Disclosure of Asserted Claims and Infringement Contentions, at 5 (Dkt. No. 142-17).

### B. The Accused Product

This lawsuit revolves around Autodesk's Maya Product, which "provides 3D modeling, animation, effects, rendering and compositing solutions" for film and video artists. Bartlett Decl., Ex. I, Autodesk Form 10-K (Dkt. No. 131-10). Maya has two XGen hair creation systems: XGen and XGen Interactive Grooming ("IGS"). In 2013, Autodesk released an update of Maya that it

3

claimed incorporated Disney's XGen technology. *Id.*, Ex. P, Autodesk website (Dkt No. 131-15). Additionally, some of IGS's code is derived from Disney's XGen code. Barath Decl., Ex. 17 (Dkt. No. 142-18). Neither of the hair creation systems' technology can be downloaded or sold independently from Maya. Alter Decl. ¶ 34. Autodesk exclusively markets and sells Maya and controls its XGen code, allowing its own software developers to work with and further develop the code. Alter Decl. ¶ 29, 34; Bartlett Decl., Ex. G, Autodesk's Responses to Alter's First Set of Requests for Admission, at RFA 9, 19, 40, 44, 46 (Dkt. No. 131-7).

## II. PROCEDURAL BACKGROUND

Autodesk filed this action in 2016 for a declaration of non-infringement and declaration of license to the '962 patent. Dkt. No. 1. After I denied a motion to dismiss or stay, Alter answered and asserted seven counterclaims against Autodesk and Disney, seeking a declaration of no license to or exhaustion of the '962 patent and asserting claims of infringement of the '962 patent by Autodesk, indirect infringement of the '962 patent by Disney, breach of contract by Disney, breach of the implied covenant of good faith and fair dealing by Disney, intentional interference with prospective economic advantage against both Autodesk and Disney, and negligent interference with prospective economic advantage against both Autodesk and Disney. Dkt. No. 34. He later stipulated to the dismissal of all claims against Disney. Dkt. 82.

Autodesk then filed an amended complaint ("FAC") to seek a declaration of license, release, and/or covenant to and declaration of non-infringement of the '962 patent, and assert claims for breach of written contract and breach of the covenant of good faith and fair dealing. FAC ¶¶ 38-53 (Dkt. No 109). Following discovery, both parties have moved for summary judgment. Dkt. Nos. 130, 142.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of

4

persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979).

## DISCUSSION

### I. AUTODESK HAS STANDING UNDER THE ALTER/DISNEY AGREEMENT

For Autodesk to prevail in its motion for summary judgment, it must first demonstrate that it is an intended third party beneficiary of the Alter/Disney License and Distribution Agreement (the "Agreement"). Under California law, a "contract, made expressly for the benefit of a third party, may be enforced by him at any time before the parties thereto rescind it." Cal. Civ. Code § 1559. "A third party qualifies as a beneficiary under a contract if the parties intended to benefit the third party and the terms of the contract make that intent evident." *Karo v. San Diego Symphony Orchestra Ass'n,* 762 F.2d 819, 821–22 (9th Cir. 1985) (citations omitted). A third party need not be expressly named or identified in a contract, but must demonstrate "that [it] is a member of a class of persons for whose benefit it was made." *Spinks v. Equity Residential Briarwood Apartments,* 171 Cal. App. 4th 1004, 1023 (2009) (internal quotation marks and citations omitted). "Whether the third party is an intended beneficiary . . . involves construction of the intention of the parties, gathered from reading the contract as a whole in light of the circumstances under which it was entered." *Prouty v. Gores Tech. Gr.,* 121 Cal. App. 4th 1225, 1233 (2004).

For Autodesk to be an intended third party beneficiary under the Agreement, it must

establish that it is a "Licensee Releasee." The Agreement defines "Licensee Releasees" as: "Licensee and its current or former Affiliates . . . and their respective officers, directors, employees, stockholders, agents, attorneys, successors, assigns, direct and indirect customers and distributors and dealers, officers, directors, managers, members, employees and all individuals or entities acting by, through, under or in concert with them." *Id.* § 2.2. There is no doubt that Autodesk was both a customer and distributor of Disney's. *See* Bartlett Decl., Ex. E, Disney/Autodesk License and Distribution Agreement (Dkt. No. 131-5). But Alter makes two arguments against its standing to enforce the rights of a Licensee Releasee.

First, Alter contends that Autodesk is excluded from this definition because it is not a customer or distributor of "Licensed Products," as defined by the Agreement. In Alter's view, the language, structure, and context of the Agreement require that "Licensee Releasees" that are Disney customers or distributors must be customers or distributors of "Licensed Products" because any other reading would be commercially unreasonable. But Alter's argument attempts to impermissibly read in an excluded limitation for the definition of "Licensee Releasees." Its definition does not include any reference to "Licensed Products." Other sections of the agreement explicitly impose limits on their provisions as to "Licensed Products." *See id.* § 2.1. That the agreement subsequently failed to do so in defining "Licensee Releasees" means that the term is not limited to "Licensed Products." *See* 17A Am. Jur. 2d Contracts § 330 (2018) ("A court may not write into a contract conditions the parties did not insert by adding or excising terms under the guise of construction"). Accordingly, "Licensee Releasees" that are Disney customers or distributors need not be customers or distributors of "Licensed Products."

Second, Alter argues that, because Autodesk is neither named or addressed in the Agreement, was not included in any of the licensing rights granted to Disney, and Disney did not ask to include Autodesk in the license, it is not an intended third-party beneficiary. In Alter's view, Autodesk is an incidental third-party beneficiary at best.

Alter relies on *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1335-36 (Fed. Cir. 2012), to argue that such a "laundry list of entities" as included in the definition of a Licensee Releasee indicates classes of incidental third-party beneficiaries rather

than intended third-party beneficiaries. But he misunderstands *ActiveVideo*. There, Verizon asserted that it was an intended third-party beneficiary to an agreement between ActiveVideo and TV Guide because it was a "customer" and "licensee" of TV Guide and the agreement between ActiveVideo and TV Guide contained a covenant that precluded infringement suits against such parties. *Id*. But while the "plain and unambiguous" language of the agreement potentially covered Verizon as a "customer" or "licensee," the circumstances under which the parties executed the agreement wholly undermined Verizon's argument. 694 F.3d at 1336. Verizon became a TV Guide customer only after the relationship between the parties to the agreement ended, and Verizon's relationship with TV Guide was unrelated to the agreement. *Id.* The court rejected Verizon's reading of the agreement as commercially unreasonable. *Id*. Alter contends that the same is true in the instant case because, under Autodesk's interpretation of the clause, any individual or entity that has ever distributed anything for Disney or has been a customer of any Disney product or service could assert that it is an intended third-party beneficiary.

This case is different. Autodesk's relationship with Disney preceded the Agreement. Its announced licensing of Disney's XGen played a big part in Alter bringing the suit that resulted in the Agreement. *See* Alter Decl. ¶¶ 19-21. Over the course of the negotiation between Alter and Disney, Disney repeatedly indicated that the Agreement would need to cover Autodesk. *Id.* ¶ 24. And, underscoring Autodesk's rights as a beneficiary, after the execution of the Agreement Autodesk "sought and received confirmation from Alter that he would not assert claims of patent infringement against Autodesk for distributing Disney's XGen for Disney." Barath Decl., Ex. 16, Alter's Disclosure of Asserted Claims and Infringement Contentions, at 5.

Under the circumstances in which the Agreement was executed in this case, so different that the ones in *ActiveVideo,* Autodesk was an intended third party beneficiary and has standing to enforce the Agreement.

## II. THE ALTER/DISNEY LICENSING AGREEMENT TERMS

Having resolved Autodesk's standing to enforce the Agreement, the next step is to determine the merits of Autodesk's contentions that (1) Alter's claims against Autodesk fall within the scope of the Covenant Not to Sue (the "Covenant") and (2) the release provision covers

7

Autodesk's use and distribution of XGen within the Maya product. Both provisions protect Autodesk from Alter's claims.

### A. The Covenant Not to Sue Applies to Alter's Claims

The Covenant states:

> Licensor on its own behalf and on behalf of each of the Licensor Releasors hereby covenants not to sue Licensee or any of the Licensee Releasees for any Claims released under Section 2.2 above. Licensor on its own behalf and on behalf of each of the Licensor Releasors also hereby covenants not to sue the entities or persons subject to the release in Section 2.2, above, including customers and those that perform work or provide services on behalf of Licensee Releasees to the extent such work or services are provided in connection with the Licensed Products. For the avoidance of doubt, Licensor on its own behalf and on behalf of each of the Licensor Releasors agrees not to assert any claims against Licensee Releasees under the Licensed Patents for any claims of direct, indirect or contributory infringement, provided, however, Licensor reserves the right to assert claims against any third party end-user that is a direct infringer of the Licensed Patents other than with respect to the Licensed Products.

Bartlett Decl., Ex. B, Disney and Alter Settlement and License Agreement § 2.1. In Autodesk's view, because it is a "Licensee Releasee," the Covenant protects it in two ways: it bars (1) "any claims against Licensee Releasees under the Licensed Patents for any claims of direct, indirect or contributory infringement," *Id.* § 2.1, and (2) any claims released in Section 2.2(i), which in turn covers claims arising out of or related to "any products or services used or distributed by or for Licensee Releasees as of [January 31, 2012]" or the "[2011 Disney] Litigation," *Id.* §§ 2.2, 2.3.

Alter argues that the Covenant does not cover Autodesk because it is limited to Disney, its affiliates, their respective employees, and others defined as "Licensee Releasees" that do not include Autodesk and extends only to the claims covered by the release provision and other work and services performed with respect to "Licensed Products." I have discussed and rejected those arguments in the previous section on Autodesk's standing.

The parties also dispute whether the third sentence in the Covenant demonstrates that Alter covenanted not to sue Licensee Releasees "under the Licensed Patents for any claims of direct, indirect or contributory infringement." *Id.* Alter contends that the introductory phrase, "For the avoidance of doubt," demonstrates the intent that the third sentence clarify the preceding two

sentences. He relies on an example in *California v. Volkswagen AG*, No. 16-CV-03620-CRB, 2017 U.S. Dist. LEXIS 93984 (N.D. Cal. 2017), to support this argument. In *Volkswagen AG*, the court entered a decree ordering:

> Defendants shall offer and sell these three additional BEV models (or their successors) in California through 2025, and they shall sell an average of 5,000 of these three additional BEV models (collectively) in California each year from 2019 until 2025. For the avoidance of doubt, this means that Defendants are required to sell 35,000 total units of the three additional BEV models (or their successors) during the seven-year period 2019 to 2025, but that they are not required to sell 5,000 units in any given year.

*Id.* at \*10-11.

I agree that the decree demonstrates how "for the avoidance of doubt" is generally used. But that is not how it was used in the Covenant. The third sentence in the Covenant addresses a different class of claims and parties than those referenced in the preceding sentences. As written, it cannot be a paraphrase of the proceeding sentences because, unlike the decree in *Volkswagen AG*, it is not merely clarifying how the two clauses come together but rather introduces new obligations into the Covenant. Alter's interpretation is not true to the plain language of the Covenant. Instead, the phrase is used in the third sentence to show that Alter entered a broad covenant not to sue, including not asserting "any claims against Licensee Releasees under the Licensed Patents for any claims of direct, indirect or contributory infringement." Alter's claims against Autodesk as to both XGen and IGS fall squarely under this language. Accordingly, the plain language of the Covenant disallows Alter's claims against Autodesk.

Extrinsic evidence suggests that the parties intended that the Covenant cover Alter's current claims against Autodesk. As discussed above, over the course of the negotiation of the Agreement, Disney repeatedly indicated that the agreement would need to cover Autodesk. Alter Decl. ¶ 24. As Autodesk points out, Alter does not testify that, at any point during the negotiations, he relayed to Disney that he wanted to limit the scope of the agreement to exclude Autodesk or limit its rights. Autodesk's Oppo. to Alter's Mot. for Summary Judgment and Cross-Motion for Summary Judgment at 27 (Dkt. No. 142). The statement he did make regarding limiting the scope of the agreement focused on Section 2.1, the licensing portion, which was

9

subsequently limited to just "Licensed Products." *See* Alter Decl. ¶ 24. After the limitation was included in the Agreement, Disney added language that broadened the scope of parties that were covered by the Covenant. Taken together, these facts support a finding that the parties intended to enter an agreement with a limited license and a broad covenant not to sue. The plain language of the Agreement controls. Alter's current claims against Autodesk related to infringement are barred by the Covenant.

### B. Whether the Release Provision Applies to Alter's Claims

Although Alter's claims against Autodesk are barred by the Covenant, I will also address whether the release provision of the Agreement applies to Alter's claims regarding XGen. In relevant part, the release provision states:

> Licensor Releasors hereby release, acquit and discharge ["Licensee Releasees"] from (i) any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of actions, suits, rights, demands, losses, debts, costs and expenses (including fees of attorneys and other professionals) of any nature whatsoever in law, equity or otherwise, known or unknown, suspected or unsuspected, fixed or contingent (collectively, "Claims"), which the Licensor Releasors had or now have or claim to have, or which Licensor Releasors at any time hereafter may have or claim to have against Licensee Releasees, or any of them, *arising out of or related to the Litigation* and any and all past, present, and future claims or allegations of infringement, inducement to infringe, contributory infringement, damages, enhanced damages, and attorneys' fees, that *in any way relate to or arise out of any products or services used or distributed by or for Licensee Releasees as of the Effective Date of this Agreement.*

*See* Bartlett Decl., Ex. B, Disney and Alter Settlement and License Agreement § 2.2 (emphasis added). Seizing onto the language "as of the Effective Date of this agreement," Alter argues that Autodesk's products, in this case XGen, are not covered by the release because they did not exist as of the effective date of the Agreement.[2]

This is an unnatural reading of the release provision. It reads out the breadth of the provision and ignores the requirement that the products or services either be used or distributed, not merely exist. To that end, Autodesk offers evidence that the functionality of the current

---

[2] Alter also argues that the release provision does not release claims against Autodesk because Autodesk is neither Disney nor a Disney affiliate and accordingly not a "Licensee Releasee" covered by the release provision, which I have previously discussed and rejected.

10

version of XGen is the same as that which it licensed from Disney. This demonstrates that Alter's claims in this action, at least as to XGen, are released because the product was distributed as of the Effective Date.

Of course, XGen also relates to the litigation between Disney and Alter. In fact, Autodesk's licensing of Disney's XGen precipitated the litigation. Because these claims are released per Section 2.2, they are also immunized by the first sentence of Section 2.3. *See id.* § 2.3 ("Licensor on its own behalf and on behalf of each of the Licensor Releasors hereby covenants not to sue Licensee or any of the Licensee Releasees for any Claims released under Section 2.2 above").

Even if I am wrong about the scope of the Covenant, Alter's claims against Autodesk as to XGen cannot proceed pursuant to the release.[3]

## CONCLUSION

For the reasons discussed above, I GRANT Autodesk's motion for summary judgment and DENY Alter's motion.[4] The parties shall indicate within seven days of this motion whether any further claims require adjudication or whether judgment should be entered in accordance with this Order.

**IT IS SO ORDERED.**

Dated: March 15, 2018

William H. Orrick
United States District Judge

---

[3] Given that Alter's claims as to XGen and IGS are barred per the terms of the Agreement, it is unnecessary to reach whether Autodesk's products are covered by Section 2.1.

[4] Autodesk's Administrative Motion for Leave to File Supplemental Opposition to Alter's Motion for Summary Judgment (Dkt. No. 159) is DENIED as moot.